## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

STEVEN FIGUEROA,
    *Plaintiff*,

v.

ARMANDO PEREZ and REBECCA
GARCIA,
        *Defendants*.

No. 3:22-cv-225 (JAM)

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Steven Figueroa has filed this action claiming that he was terminated from his

employment as a police officer because he is Hispanic. He was employed as a police officer in

Bridgeport, Connecticut, and he has sued the former Bridgeport police chief, Armando Perez, as

well as the former acting police chief, Rebecca Garcia. He alleges pursuant to 42 U.S.C. § 1983

that Perez and Garcia violated his constitutional right to equal protection under the law.

Both Perez and Garcia move for summary judgment. I will grant Garcia's motion because

Figueroa makes no effort in his opposition to the summary judgment motion to show that Garcia

violated his rights. He has abandoned any claim against Garcia. On the other hand, for the

reasons set forth in the rest of this ruling, I will deny Perez's motion on the ground that there is a

genuine issue of fact to show that Perez would not have terminated Figueroa's employment but

for taking into account that Figueroa was Hispanic.

### BACKGROUND

The following facts are drawn primarily from the parties' respective statements of

material fact.[1] Figueroa began his employment as a police officer with the Bridgeport police

---

[1] Doc. #66-2 (defendants' statement of material facts); Doc. #74 (Figueroa's statement of material facts). Because Figueroa's statement of material facts recites and responds to the defendants' statement of material facts, for ease of

department in February 2016, and he was terminated in August 2019.[2]

Figueroa was arrested numerous times while he served as a Bridgeport police officer, although none of the arrests led to a conviction. In late 2017, Figueroa was arrested by the police in Stratford, Connecticut for allegedly punching out the car window of his then-girlfriend.[3] In April 2018, he was arrested by the police in Bridgeport following an alleged argument with the same girlfriend and several other women.[4] He was arrested a third time later that year by the police in Milford, Connecticut after allegedly throwing a drink in the face of his then-ex-girlfriend while she was on a date with another man.[5] For these first three arrests, Figueroa was disciplined by the Bridgeport police department by a loss of ten holidays.[6]

On June 29, 2019, the police in Shelton, Connecticut arrested Figueroa for alleged risk of injury to a child and unlawful restraint.[7] The incident of June 29 was the basis for two more arrests in July 2019.[8] First, the Shelton police arrested Figueroa again on a more serious charge of first-degree sexual assault.[9] Then the Bridgeport police arrested Figueroa for allegedly violating the terms of a 2018 conditional discharge.[10]

For purposes of Figueroa's employment status with the Bridgeport police department, its office of internal affairs conducted an investigation, and in August 2019, the office forwarded to Perez in his capacity as chief of police a copy of an investigative report concerning the events of

reference this ruling generally cites Figueroa's statement of material fact insofar as the parties agree that particular facts are true.
[2] Doc. #74 at 1 (¶¶ 3-4).
[3] *Id.* at 1 (¶ 5).
[4] *Id.* at 1-2 (¶ 6).
[5] *Id.* at 2 (¶ 7).
[6] *Id.* at 2 (¶ 8).
[7] *Id.* at 2 (¶ 9).
[8] Doc. #66-3 at 33-34.
[9] Doc. #74 at 2 (¶ 10).
[10] *Id.* at 2 (¶ 11).

June 29.[11] The internal affairs report stated that an officer at Shelton police department attended a walk-in complaint made by J.M., Figueroa's ex-girlfriend and the mother of his two-month-old child, concerning a violent domestic dispute, and that the officer documented visible injuries to J.M.'s face, chest, and left arm.[12] J.M. identified Figuroa as her assailant.[13] The report included a detailed account given by J.M. about Figueroa's alleged visit to her apartment and subsequent assault.[14] J.M. reported that Figueroa punched, threatened, and raped her, among other acts of violence.[15]

The report then described two interviews that were conducted by the office of internal affairs with Figueroa in which he acknowledged his standing order to update the investigator of subsequent arrests or additional circumstances arising from the June 29 incident.[16] The report concluded that Figueroa repeatedly failed to notify the office of internal affairs of his subsequent arrests and found him to have violated a department rule forbidding insubordination.[17] The report added that, in fewer than three-and-a-half years as a Bridgeport police officer, Figueroa had been arrested six times.[18]

In deciding whether to terminate Figueroa, Perez relied on at least the arrest reports, the report of the office of internal affairs, and testified that he believed both the physical and sexual assaults had occurred.[19] Perez also testified that he acted on the recommendations of his command staff, labor relations, and the city attorney's office.[20]

---

[11] *Id.* at 3 (¶ 12).
[12] *Id.* at 2 (¶ 9), 3 (¶¶ 13-15).
[13] *Id.* at 3 (¶ 16).
[14] *Id.* at 3-8 (¶ 17-45).
[15] *Id.* at 4-8 (¶¶ 23-45).
[16] *Id.* at 8-9 (¶¶ 46-49).
[17] *Id.* at 9 (¶ 51).
[18] *Id.* at 9 (¶ 52).
[19] *Id.* at 9-10 (¶¶ 53-54).
[20] Doc. #74-2 at 44-45.

In his deposition, Perez elaborated further on his general approach toward disciplining Figueroa. Of the first arrest, Perez noted: "He was charged in violation of policies and procedures and . . . I always believed that people should have a second chance, sometimes even a third chance. And in his case he's a Hispanic officer, young officer . . . . I knew his dad . . . so I felt close to him . . . . I had the Hispanic society president . . . as well as other senior Hispanic police officers, reach out to him." Perez concluded: "I believe in giving everybody a second chance, even a third chance. Since he was Hispanic and I'm Hispanic, okay, I took a special interest in him."[21]

Concerning his ultimate decision to terminate Figueroa rather than engage in additional progressive discipline, Perez explained: "There were three previous arrests that I believe I bent over backwards to make him understand that that behavior should not be tolerated, cannot continue, that he was a valuable member of the Bridgeport Police Department, and as a Hispanic society member, you set an example to others not to do those things."[22] Of the sexual assault, he added, "We, as police officers, arrest people for that kind of behavior or less . . . . You can't be a police officer and behave like that."[23] Perez terminated Figueroa's employment on August 21, 2019.[24]

In pressing his claim that he was terminated because he is Hispanic, Figueroa compares his treatment to another non-Hispanic Bridgeport police officer named Paul Cari. In 2015, Cari pleaded no contest to a series of charges and was convicted of second-degree threatening.[25] The internal affairs report stemming from Cari's conviction stated that in 2013 he went to the

---

[21] *Id.* at 20-21.
[22] *Id.* at 39-40.
[23] *Id.* at 40.
[24] Doc. #74 at 1 (¶ 4).
[25] *Id.* at 10 (¶ 56).

apartment of his ex-girlfriend, where he met her and a male acquaintance.[26] Cari attacked the

man, repeatedly punching him in the face and striking him in the head with a glass vase.[27]

On January 9, 2020, Officer Cari received a verbal warning from Perez for the events

underlying his conviction.[28] Perez offered an explanation for this decision in his deposition,

stating that he took into account the length of time that had passed since the incident and the fact

that Cari had not engaged in any subsequent misconduct but rather had "bec[o]me an asset" to

the Bridgeport police department.[29]

Perez moves for summary judgment. He argues that in light of the number and

circumstances of Figueroa's arrests, there is no genuine issue of fact to show that he terminated

Figueroa's employment because of Figueroa's Hispanic race. Figueroa opposes the motion for

summary judgment, contending that Perez's deposition testimony establishes that he explicitly

considered Figueroa's Hispanic race and also that he was treated differently than Cari.[30]

### DISCUSSION

The principles governing review of a motion for summary judgment are well established.

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). I must view the facts in the light most favorable to the party who opposes the motion for

summary judgment and then decide if those facts would be enough—if eventually proved at

trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at

summary judgment is not to judge the credibility of witnesses or to resolve close, contested

---

[26] *Id.* at 10 (¶¶ 58-60).
[27] *Id.* at 10 (¶ 60).
[28] *Id.* at 10 (¶ 55).
[29] *Id.* at 11 (¶ 62). He also cited Cari's pardon from the governor and the fact that immediately after receiving it, Cari submitted a letter assuming responsibility for his conduct, apologizing, and "showing true remorse." *Ibid.* But the record indicates that Cari was pardoned nearly a year after the reprimand in October 2020. Doc. #66-3 at 171-72.
[30] Doc. #73 at 3-16.

issues of fact but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[31]

The Equal Protection Clause of the Fourteenth Amendment—as enforceable under 42 U.S.C. § 1983—protects against discrimination by a state or local government on the basis of a person's race. This includes the right of a state or local government public employee to be free from discrimination by their public employer because of the employee's race. *See Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023). In order for a public employee to show that their employment was terminated because of their race, they must show that their race was a "but for" cause of the termination decision. *See Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).

Figueroa alleges that he was terminated because he is Hispanic. Discrimination because of a person's Hispanic ethnicity is the same as discrimination because of a person's race. *See Vill. of Freeport v. Barrella*, 814 F.3d 594, 598 (2d Cir. 2016).

At summary judgment, a court may analyze the merits of a discrimination claim in one of two ways. The most common approach is by means of the *McDonnell Douglas* framework as borrowed from Title VII jurisprudence. *See Buon*, 65 F.4th at 78. Under the *McDonnell Douglas* test, a plaintiff first bears the initial burden of establishing a *prima facie* case of discrimination, *e.g.*, that (1) the plaintiff is a member of a protected class, (2) was qualified for the position, (3) suffered an adverse employment action, and (4) there is at least minimal evidentiary support for the proposition that the employer was motivated by discriminatory intent. *Id.* at 78, 79. Next, if the plaintiff makes out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* at 78. Lastly, if the defendant

---

[31] Unless otherwise noted and for ease of reading, this ruling omits all internal quotations, brackets, and derivative citations for all quotations from cases.

advances a proper reason, then the ultimate burden falls back on the plaintiff to show that the

reason proffered by the defendant is a pretext for discrimination. *Id.* at 78-79. More precisely, the

plaintiff's ultimate burden is to show that the defendant's proffered reason is either false or that it

is incomplete, such that the real reason for the adverse action was because of the plaintiff's

protected status. *See Bart v. Golub Corp.*, 96 F.4th 566, 575-76 (2d Cir. 2024).

But the *McDonnell Douglas* framework does not always apply. As the Second Circuit has

observed, "[c]ircumstantial evidence is often the sole avenue available to most plaintiffs to prove

discrimination" and that "[w]hen only circumstantial evidence of discriminatory intent is

available, courts use the *McDonnell Douglas* burden-shifting framework to assess whether the

plaintiff has shown sufficient evidence of discrimination to survive summary judgment." *Id.* at

569. Thus, "'[t]he shifting burdens of proof set forth in *McDonnell Douglas* are designed to

assure that the plaintiff [has her] day in court *despite the unavailability of direct* evidence,'" and

"[t]he '*McDonnell Douglas* test is *inapplicable* where the plaintiff presents direct evidence of

discrimination," *e.g.*, that the employer's motivation was 'discriminatory on its face.'" *Porter v.*

*Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (emphasis in original)

(quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

What is "direct evidence"? As the Second Circuit recently explained in *Porter*, the term

"direct evidence" includes "'*statements or actions by [the employer's] decisionmakers . . . that*

*may be viewed as directly reflecting* the alleged *discriminatory attitude*' [to] constitute the

proverbial 'smoking gun.'" *Ibid.* (emphasis in original) (quoting *Bickerstaff v. Vassar College*,

196 F.3d 435, 448 (2d Cir. 1999)).

And so in *Porter*, the Second Circuit ruled that there was "direct evidence" of disability

discrimination where there was evidence that the decisionmaker—when asked why the plaintiff

was being terminated—stated that it was because she was "on disability." *Id.* at 150. Rejecting

the district court's reasoning that discounted this statement, the Second Circuit ruled that the fact

that there were "'other possible interpretations'" of the statement (such as that the decisionmaker

was referring simply to the fact that the plaintiff had alternative income from being "on

disability") and that the statement did not necessarily constitute a "'confession'" that plaintiff has

been terminated "'because she was partially disabled'" did not mean that the statement was not

"direct evidence." *Ibid.* (quoting district court ruling).

      The Second Circuit went on to explain that "[i]n finding that Dr. Merrens's 'on disability'

response to the 'why' question was 'inconclusive,' the [district] court applied the wrong standard

for assessing evidence adduced in opposition to a motion for summary judgment," because

"[s]uch evidence need not be conclusive; it need only be, when viewed in the light most

favorable to the claimant, sufficient to present a genuine issue as to a material fact," and "if it

meets that standard, it is the province of the factfinder, not the summary judgment court, to

decide what to conclude." *Ibid.*[32]

      Here, there is direct evidence that Perez fired Figueroa because of his Hispanic race.

Perez's deposition testimony reveals that he explicitly took Figueroa's Hispanic identity into

account when he decided to terminate his employment. Perez testified that he took a special

interest in Figueroa because of their shared Hispanic identity: "Since he was Hispanic and I'm

---

[32] Perez has filed two supplemental briefs on the "direct evidence" issue that do not cite or acknowledge the Second Circuit's decision in *Porter*. Instead, Perez cites decisions outside of the Second Circuit to argue that evidence is not "direct evidence" unless it is a statement that constitutes no less than an "admission" by the decisionmaker that the decision was motivated by discriminatory animus. *See* Doc. #85 at 1 (citing and discussing *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009)); Doc. #86-1 at 1-4 (citing and discussing *Anderson v. CATO Corp.*, 444 Fed. Appx. 280 (10th Cir. 2011)). To the extent that these decisions may be interpreted to limit "direct evidence" cases to only those cases where the decisionmaker has unequivocally admitted or confessed to acting for unlawful reasons, they are inconsistent with the Second Circuit's ruling in *Porter* that "direct evidence" cases include a broader range of statements by the decisionmaker that—even if "inconclusive"—could be viewed by a reasonable jury as "directly reflecting the alleged discriminatory attitude" that led to the adverse action. *See Porter*, 92 F.4th at 149, 150.

Hispanic, okay, I took a special interest in him."[33] Then, when asked why he chose to terminate

Figueroa's employment rather than to impose a lesser sanction, Perez testified that "as a

Hispanic society member, you set an example to others not to do those things."[34]

A reasonable jury could conclude from this testimony that Perez held Figueroa to a

higher standard of conduct specific to Hispanic officers. Rather than considering how all police

officers should behave, Perez may have anchored on how he thought Hispanic police officers

should behave. And in light of Perez's testimony referring to his shared Hispanic heritage with

Figueroa a reasonable jury could conclude that Perez was particularly piqued by Figueroa's

alleged misconduct as it may reflect poorly on Hispanics in general and Perez himself as well.

To be sure, Perez testified later in his deposition that he felt no "particular concern" for

Figueroa on account of their shared ethnicity and that "what I felt for Figueroa I felt for all the

other police officers. I tried to treat everybody the same way."[35] But it is for a jury to consider

contradictions in Perez's testimony concerning whether he took Figueroa's Hispanic identity into

account when he decided to terminate his employment.

Of course, a jury might decide that, if anything, Figueroa's Hispanic race was a plus-

factor for Perez that made him more reluctant than he otherwise would have been to terminate

his employment. The point is that it is not my role to decide what inference to draw. It is a jury's

job to do so.

Nor is it dispositive that Perez had ample grounds to terminate Figueroa's employment in

light of the alarming number and nature of his arrests and in light of the adverse information

disclosed in the internal affairs report. The relevant issue is not whether Perez *could* have

---

[33] Doc. #74-2 at 21.
[34] *Id.* at 40.
[35] Doc. #74-3 at 50.

terminated Figueroa's employment for legitimate reasons. The issue is whether he *would* not have terminated Figueroa's employment but for consideration of Figueroa's Hispanic race. On this issue—in light of Perez's deposition testimony explicitly referencing his consideration of Figueroa's Hispanic race—there is a genuine issue of fact for a jury to decide. And because Perez's deposition testimony is sufficient by itself to create a genuine fact issue for trial, I need not further consider whether Figueroa's comparator evidence as to Cari is also enough to create a genuine fact issue of discriminatory intent.

Lastly, Figueroa has sued Perez in both his individual and official capacity. In light of Perez's concession at oral argument that he was the city's policymaker for purposes of the termination of Figueroa's employment, there is no need for me to separately analyze Figueroa's official-capacity claim apart from his individual-capacity claim. *See Perez v. Annucci*, 2019 WL 1227801, at *4 (S.D.N.Y. 2019) (explaining how official-capacity claims are governed by the policy-or-custom standard of *Monell v. Department of Social Services*, 436 U.S. 658 (1978)). "Where a city official has final authority over significant matters involving the exercise of discretion, his choices represent government policy." *Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) (internal quotations omitted).

CONCLUSION

For the reasons stated above, the Court GRANTS in part and DENIES in part the defendants' motion for summary judgment. It GRANTS the motion as to defendant Rebecca Garcia but DENIES the motion as to defendant Armando Perez.

It is so ordered.

Dated at New Haven this 30th day of September 2024.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer

United States District Judge